IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASHLEY CORBETT, an individual, on behalf of herself and all others similarly situated, ) ) ) Plaintiff, ) ) vs ) ) SIMPLIFIED BUSINESS GROUP, LLC, a Utah ) Limited liability company, d/b/a "Rent Plus" and ) "Rent Dynamics, ) ) Defendants. ) | Civil Action No. 2:24-1580 Magistrate Judge Patricia L. Dodge |

### MEMORANDUM OPINION

Plaintiff Ashley Corbett brings this putative class action against Defendant Simplified Business Group, LLC, d/b/a "Rent Plus" and "Rent Dynamics" ("SBG"), alleging claims under the Credit Repair Organizations Act, 15 U.S.C. §§ 1679-1679j ("CROA") and related laws. Plaintiff's claims arise out SBG's alleged practice of providing credit repair services to consumers without meeting the requirements of the CROA.

Presently pending before the Court is Defendant's motion to stay proceedings and compel arbitration (ECF No. 14) pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3-4 ("FAA"). For the reasons that follow, its motion will be denied.[1]

### I. Relevant Procedural History

Plaintiff commenced this action on November 18, 2024 (ECF No. 1). In addition to alleging CROA violations (Count I), the Complaint requests injunctive and declaratory relief

---

[1] "A ruling on a motion to compel arbitration does not dispose of the case, or any claim or defense found therein." *Virgin Islands Water & Power Auth. v. General Elec. Int'l, Inc.*, 561 F. App'x 131, 134 (3d Cir. 2014). Therefore, it can be resolved by a magistrate judge regardless of whether the parties consent to full jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c). *See Brown v. Power Block Coin, LLC*, 2024 WL 1468375, at *3 n.1 (W.D. Pa. Apr. 4, 2024).

(Count II) and asserts a state law claim of unjust enrichment (Count III). Federal question subject matter jurisdiction, 28 U.S.C. § 1331 and 15 U.S.C. § 1679g, applies to the CROA claims.[2] Supplemental jurisdiction would exist over the state law claim pursuant to 28 U.S.C. § 1367(a).

On January 27, 2025, Defendant filed the motion currently under consideration (ECF No. 14), which has been fully briefed (ECF Nos. 15, 23, 27).

## II.     Facts Relevant to the Pending Motion

Plaintiff states that, on or about February 21, 2024, she entered into an apartment lease contract ("Apartment Lease") with WE Barber Park Owners, LLC ("Barber Park") for an apartment unit she occupied with her family in Orlando, Florida. As part of the lease documents, Barber Park inserted a "Credit Reporting Addendum." (Compl. ¶¶ 10-12; Corbett Decl. ¶¶ 6-8) (ECF No. 24 & Exs. A, B).[3] The Credit Reporting Addendum states in relevant part that it relates to enrollment:

> in RentPlus, a credit reporting and financial tool that reports the timeliness and completeness of [her] rent payments due under the Lease Agreement and this addendum. . . Resident's enrollment in RentPlus shall be subject to the terms and conditions of use that can be found at www.rentplus.com/terms-of-use.html. The RentPlus services and fees may be altered, changed, terminated or otherwise modified by RentPlus with thirty (30) days' advance notice to Resident. Resident(s) hereby acknowledge that [Barber Park] will provide the above described payment information to RentPlus and that Resident(s) will be enrolled in RentPlus.

(Compl. Ex. C.)

---

[2] The Complaint cites 28 U.S.C. § 1337, which provides that federal courts have jurisdiction over "any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies." This Court's research has not revealed any case relying on § 1337 as the basis for a CROA claim.

[3] In her brief, Plaintiff states that "the landlord required that [she] sign a 'Credit Reporting Addendum.'" (ECF No. 23 at 2.) However, as SBG notes, neither the Complaint nor Plaintiff's declaration makes this assertion—in fact, the Complaint alleged that Barber Park offered credit building services as an optional service (Compl. ¶ 11).

SBG offers RentPlus services to tenants at Barber Park. Its records indicate that Plaintiff enrolled in RentPlus on February 25, 2024 as a result of her lease of a Barber Park apartment. Plaintiff states that, "Under the Credit Reporting Addendum, I paid a monthly credit builder program fee of $8.95 ("Credit Builder Fees") to SBG through my landlord, Barber Park, to help me build my credit by only reporting my on-time rent payments to the three major credit bureaus." (Corbett Decl. ¶ 9; Compl. ¶¶ 13-14.) Her enrollment was subject to a two-month trial period in February and March 2024. (Gardner Decl. ¶¶ 5-6) (ECF No. 16).

Plaintiff paid monthly charges for RentPlus services starting in April, May, June and July 2024. SBG states that these charges were billed to her as a separate line item, along with rent and utilities each month. (Gardner Decl. ¶ 9.) However, it does not dispute Plaintiff's assertion that the fees to RentPlus were paid by the landlord out of the rent Plaintiff paid.

SBG states that it sent a "welcome email" to Plaintiff when she enrolled in RentPlus in February 2024. The "welcome email" that SBG indicates that it sent to Plaintiff states that all she had to do was "pay your rent and we will report your monthly payments to the credit bureaus." (Compl. Ex. C.) It also has an "Access my Account" link and describes that the app can be used to see Plaintiff's reporting history and manage her subscription. (*Id.*) The welcome email does not reference any terms or conditions. (*Id.*) According to RentPlus' records, Plaintiff opened the welcome email. (Gardner Decl. ¶ 8 & Ex. C.) Plaintiff denies that she either received or opened a "welcome email," however.[4] In fact, she asserts that she never received any communications from SBG or anyone using the tradename "RentPlus," "Rent Plus," "Rent Dynamics" or "Simplified Business Group." (Corbett Decl. ¶¶ 12-15.)

---

[4] In her brief, Plaintiff disputes Gardner's statement that Exhibit C to his declaration represents a "true and correct copy" of the welcome email. She argues that while it may be a template of what SBG represents to be a welcome email, it does not meet the standard for admission under Fed. R. Evid. 901. (ECF No. 23 at 10.)

When Plaintiff enrolled in RentPlus, SBG's Terms of Use dated April 17, 2023 ("April 2023 Terms") were posted on the RentPlus website. (Gardner Decl. ¶ 7 & Ex. B.) The April 2023 Terms do not contain an arbitration provision. They do state, however, that:

> By using this Site, you agree to be bound by these Terms of Use. IF YOU DO NOT AGREE TO BE BOUND BY THESE TERMS OF USE, PLEASE DO NOT USE OR ACCESS THE SITE.
>
> SBG reserves the right at its sole discretion to change, modify, add, or remove portions of these Terms of Use at any time. It is your responsibility to check these Terms of Use periodically for changes. Your continued use of the Site following the posting of changes will mean that you accept and agree to the changes.

(*Id.* Ex. B at 1-2.)

On June 6, 2024, after Plaintiff enrolled in RentPlus, SBG modified its Terms of Use ("June 2024 Terms"). In addition to repeating the language quoted above (Gardner Decl. Ex. A at 1), the twenty-page June 2024 Terms include the following paragraph beginning on page 12 under the heading "General:"

> SBG's failure to act in a particular circumstance does not waive its ability to act with respect to that circumstance or similar circumstances. Any provision of these Terms that is found to be invalid, unlawful, or unenforceable will be severed from these Terms, and the remaining provisions of these Terms will continue to be in full force and effect. The section headings and titles in these Terms are for convenience only and have no legal or contractual effect. Any provision in these Terms that by its nature should survive the termination of User's license to access the Site or any termination of these Terms (including, without limitation, provisions governing indemnification, limitations on liability, disclaimers of warranty, and ownership of intellectual property) will continue to remain in full force and effect after any such termination. These Terms are governed by the laws of the State of Utah, excluding conflicts of law principles. Any controversy or claim arising out of or relating to the Site, Services or these Terms must be commenced within one year after the claim arose and will be settled by binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association. Any such controversy or claim will be arbitrated on an individual basis and will not be consolidated in any arbitration with any claim or controversy of any other party. The arbitration will be conducted in Salt Lake City, Utah, and any judgment on the arbitration award may be entered into any court of competent jurisdiction. The award of the arbitrator will be final and binding upon the parties without appeal or review except as provided by Utah

> law. Either party may seek any interim or preliminary injunctive relief from any court of competent jurisdiction, as necessary to protect the party's rights or property pending the completion of arbitration. These Terms, including all policies and guidelines incorporated into these Terms by reference, constitute the entire agreement between User and SBG concerning the Site and Services. These Terms supersede all prior agreements or communications between User and SBG regarding the subject matter of these Terms.

(Gardner Decl. ¶ 4 & Ex. A at 12-13.)

According to Plaintiff, she had never seen and was not made aware of the June 2024 Terms until she read the Gardner Declaration in this case. (Corbett Decl. ¶¶ 18-19.) Further, she claims that she has never used a website connected with SBG nor has she agreed to arbitrate "anything with anyone concerning the Lease Agreement, including the Credit Reporting Addendum, or claims against SBG." (Corbett Decl. ¶¶ 20-22.) Finally, she notes that she did not receive thirty days' advance notice from SBG that it was changing the terms of its services. (*Id.* ¶¶ 16-17.)

### III.  Standard of Review

The Federal Arbitration Act governs the present controversy. As recently summarized by the Court of Appeals for the Third Circuit, the FAA:

> enables judicial enforcement of a contract to arbitrate after the court "hear[s] the parties" and is "satisfied that the making of the agreement for arbitration ... is not in issue[.]" [9 U.S.C.] § 4. Thus, before compelling arbitration, a court will typically determine that "(1) a valid agreement to arbitrate exists, and (2) the particular dispute falls within the scope of the agreement." *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 160 (3d Cir. 2009); *see also Sandvik AB v. Advent Int'l Corp.*, 220 F.3d 99, 112 (3d Cir. 2000) (holding that "when the very existence of . . . an [arbitration] agreement is disputed, a district court is correct to refuse to compel arbitration until it resolves the threshold question of whether the arbitration agreement exists").

*Young v. Experian Info. Sols., Inc.*, 119 F.4th 314, 318-19 (3d Cir. 2024). The Third Circuit noted that, in *Guidotti v. Legal Helpers Debt Resolution,, L.L.C.*, 716 F.3d 764 (3d Cir. 2013), it laid out two paths for district courts to follow in making that determination: "when it is apparent,

5

based on the face of a complaint, and documents relied upon in the complaint, that . . . a party's claims are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery[.]" *Id.* at 319 (quoting *Guidotti*, 716 F.3d at 776 (internal quotation marks omitted). But "if a complaint does not set forth clearly that the claims are subject to an arbitration agreement, or if the plaintiff rebuts the motion to compel 'with reliable evidence that is more than a naked assertion . . . that it did not intend to be bound by the arbitration agreement,' then the court should apply the Rule 56 standard." *Id.* (quoting *Guidotti*, 716 F.3d at 774).

Some of the language in *Guidotti* suggested that courts *must* allow for discovery on the issue of arbitrability, but the Court of Appeals clarified in *Young* that "[in] the absence of a factual dispute, there is nothing to discover and thus no need to delay a decision on the motion to compel." 119 F.4th at 319-20. In *Young*, the only issue in dispute was the scope and enforceability of the agreement, but the agreement expressly delegated those questions to the arbitrator and thus there was nothing further for the court to resolve. *See also Cornelius v. CVS Pharmacy Inc.*, 2025 WL 980309, at *6-7 (3d Cir. Apr. 2, 2025) (district court erred by claiming to resolve motion to compel arbitration under a Rule 12(b)(6) standard, but then considering materials outside the complaint without discussing whether discovery was needed).

In this case, the face of the Complaint and documents on which it relies contain no reference to an arbitration agreement, and both SBG and Plaintiff have submitted declarations and materials outside the pleadings. Plaintiff's declaration is not a mere denial that she did not intend to be bound by an arbitration agreement; she denies ever being informed that SBG altered its Terms of Use to include such an agreement. Thus, there is no question that the Rule 56

6

standard of review applies.[5]

The next question is whether further discovery is required in this case on the issues raised in SBG's motion. Plaintiff has not requested discovery and asserts that SBG has not met its burden to demonstrate that the case should be referred to arbitration. (ECF No. 23 at 2.) Addressing Plaintiff's responses to the Gardner Declaration in its reply brief, SBG argues that the facts challenged by Plaintiff are not material, but if the Court concludes that Plaintiff has raised genuine fact issues, it requests limited discovery on the narrow question raised by its motion. (ECF No. 27 at 3 n.3.) However, SBG does not indicate what facts remain to be developed in discovery and, in any event, under a summary judgment standard, the Court would resolve all disputes in favor of Plaintiff as the non-moving party. *See Guidotti*, 716 F.3d at 772 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).[6]

In addition, the Rules of Civil Procedure explicitly state that, "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may [take various actions]." Fed. R. Civ. P. 56(d). *See Cornelius*, 2025 WL 980309, at *7. But in this case, SBG is the moving party, not the nonmovant, and it has not submitted an affidavit or declaration explaining its need for discovery on this issue.

---

[5] Plaintiff agrees that Rule 56 applies. (ECF No. 23 at 2.) SBG appears to suggest without further discussion that the Rule 12(b)(6) standard applies. (ECF No. 15 at 5.) However, it does not explain how the Court could determine whether this matter must be referred to arbitration without reviewing both the Gardner and Corbett Declarations, as well as the documents attached to both its motion and Plaintiff's response.

[6] It appears that the only factual dispute between the parties is whether Plaintiff received and opened a "welcome email" from SBG. However, as discussed below, whether or not she did so, SBG contends that by signing the Credit Reporting Addendum, Plaintiff was placed on notice that her enrollment was subject to its terms and conditions of use as well as how to access these terms and conditions. Notably, both the April 2023 and June 2024 Terms of Use state that "continued use of the Site following the posting of changes will mean that you accept and agree to the changes." There is no evidence that Plaintiff used or continued to use the RentPlus website.

7

Therefore, the Court will not require discovery into the issue of arbitrability in this case but will decide the motion based on the current record using the Rule 56 standard of review.

## IV. Choice of Law

The issue here is whether Plaintiff agreed to arbitration. "To determine whether the parties agreed to arbitrate, we turn to 'ordinary state-law principles that govern the formation of contracts.'" *Kirleis*, 560 F.3d at 160 (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). SBG argues that Pennsylvania law applies because the case was filed here.[7] The lease was signed in Florida and the June 2024 Terms state that, "These Terms are governed by the laws of the State of Utah, excluding conflicts of law principles." (Gardner Decl. Ex. A at 12.)[8]

In a federal question case, the court follows the choice of law principles of the forum state in determining which state's law applies. *See Gay v. CreditInform*, 511 F.3d 369, 389 (3d Cir. 2007) (applying forum state's choice of law principles in a CROA action). "In applying state law at step one, we do *not* invoke the presumption of arbitrability." *Jaludi v. Citigroup*, 933 F.3d 246, 255 (3d Cir. 2019).

---

[7] The Complaint asserts that venue is proper under 28 U.S.C. § 1391(b)(2), which allows a case to be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." SBG states that it "reserves the right to challenge Plaintiff's choice of venue at the appropriate time given that none of the alleged conduct occurred in Pennsylvania." (ECF No. 15 at 6 n.3.) The Court observes that the filing of this action in the Western District of Pennsylvania was likely a mistake. Plaintiff states that SBG "may be served through its registered agent for service, to wit: Corporate Service Company, 2595 Interstate Drive, Suite 103, Harrisonburg [sic], Pennsylvania 17110." (Compl. ¶ 4.) Harrisonburg is a city in the Western District of Virginia; Harrisburg (where CSC has an office at that address) is located in the Middle District of Pennsylvania.

[8] The April 2023 Terms stated that: "To the maximum extend provided by law, these Terms of Use are governed by the laws of the State of Utah and you hereby consent to the exclusive jurisdiction and venue of courts in the state and federal courts in Cache County, Utah in all disputes arising out of or relating to the use of the . . . website." (Gardner Decl. Ex. B at 10.)

"Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions in contracts executed by them." *Kruzits v. Okuma Mach. Tool, Inc.*, 40 F.3d 52, 55 (3d Cir. 1994) (citation omitted). However, where "the contractual choice-of-law provision . . . is narrowly drawn to govern only the provisions of the agreement, without regard to the validity of the agreement itself, it is inapplicable to Plaintiff's challenge to the validity and enforceability of the arbitration agreement Defendant seeks to enforce." *Happy v. Marlette Funding, LLC*, 744 F. Supp. 3d 403, 411 (W.D. Pa. 2024).

The Court of Appeals has held that "If two jurisdictions' laws are the same, then there is no *conflict* at all, and a choice of law analysis is unnecessary. Thus, the first part of the choice of law inquiry is best understood as determining if there is an *actual* or real conflict between the potentially applicable laws." *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 230 (3d Cir. 2007).

SBG argues that there is no conflict between the law of Utah (where it has its place of business) and Florida (where Plaintiff resided)[9] with respect to the formation of an agreement to arbitrate: *Cea v. Hoffman*, 276 P.3d 1178, 1185 (Utah Ct. App. 2012) ("formation of a contract requires an offer, an acceptance, and consideration"); *Penhall v. Young Living Essential Oils, LC*, 2022 WL 15504063, at *6 (D. Utah Oct. 27, 2022) ("most clickwrap agreements generally contain adequate notice"); *Derriman v. Mizzen & Main LLC*, 710 F. Supp. 3d 1129, 1138 (M.D. Fla. 2023) ("In Florida, an enforceable contract requires offer, acceptance, consideration, and sufficient specification of essential terms."); *Massage Envy Franchising, LLC v. Doe*, 339 So. 3d 481, 484-85 (Fla. Dist. Ct. App. 2022) (clickwrap agreements provide sufficient notice when they direct a party to the terms via hyperlink and direct her to assent).

---

[9] In her declaration, Plaintiff indicates that she is a Sergeant First Class with the United States Army Reserve and a Department of Army Civilian employee and that she was recently transferred from Florida to Fort Jackson, South Carolina. (Corbett Decl. ¶ 5.)

As explained below, Plaintiff does not contend that there is a conflict between Utah and Florida law. Rather, she disputes SBG's contention that it provided her with notice of the change in terms to include an arbitration provision or that a clickwrap agreement existed.

## V. Discussion

In relevant part, the FAA provides that:

> A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.

The FAA represents a "federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). However, the policy is to make "arbitration agreements as enforceable as other contracts, but not more so." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 418 (2022) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967)). The FAA also has a "fundamental rule that parties are not required to arbitrate when they have not agreed to do so." *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 544 (3d Cir. 2009) (citation omitted). *See also Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 299 (2010) ("Arbitration is strictly a matter of consent.")

The Supreme Court has held that, although CROA contains language stating that consumers have a "right to sue" for violations of the Act, they may agree to proceed in an arbitral forum under the FAA. *See CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 104 (2012).

A.  Was There an Express Agreement to Arbitrate?

SBG asserts that Plaintiff agreed to submit a dispute of this nature to arbitration. It notes that Plaintiff enrolled in RentPlus on February 25, 2024, and signed the Credit Reporting Addendum. While the April 2023 Terms that were in effect at that time did not include an agreement to arbitrate, they did indicate that SBG could change its Terms of Use at any time and asserted that it was Plaintiff's responsibility to check them periodically for changes. On June 6, 2024, several months after Plaintiff enrolled, new Terms of Use posted to its website included a mandatory arbitration provision. SBG notes that Plaintiff continued to use the RentPlus services after that date and was billed separately for RentPlus services. Therefore, it asserts, she is bound by the arbitration provision, and because her claims fall within its scope, this dispute must be sent to arbitration.

In response, Plaintiff notes that the April 2023 Terms that were in place when she enrolled in RentPlus did not include an arbitration provision. She claims that she did not receive or access the welcome email, never used the RentPlus website and never accessed her account. Further, she was not notified that SBG was altering the Terms of Use to include such a provision, and at any rate, SBG's Credit Reporting Addendum states that it will provide customers with thirty days' notice of any changes to RentPlus services or fees.[10]

SBG argues in its reply brief that the Credit Reporting Addendum Plaintiff signed advised her of how to access the terms and conditions on the RentPlus website and informed her that her enrollment was subject to these terms and conditions (that is, the April 2023 Terms). Moreover, it argues, because the April 2023 Terms provided that it was Plaintiff's responsibility

---

[10] Plaintiff does not address whether her claims would fall within the scope of the arbitration agreement. Because the Court concludes that no agreement to arbitrate was formed, it need not address this issue.

to check the website periodically for any changes to the terms, her failures to access the website or click on the Terms of Use and read them are irrelevant. Finally, it argues that the thirty-day notice provision she cites applies only to modification of "services and fees," not to terms or other matters such as arbitration.

It is undisputed that SBG's April 2023 Terms did not contain an arbitration provision. It is further undisputed that SBG provided no direct notice to Plaintiff that it changed the Terms of Use in June 2024 or that these changes included a binding arbitration provision. Therefore, in order to compel arbitration in this case, SBG must demonstrate that Plaintiff is nonetheless bound by the arbitration provision in the June 2024 Terms.

### B. Clickwrap versus Browsewrap Agreements

The parties dispute whether the facts in this case demonstrate the existence of a clickwrap or a browsewrap agreement, and even if one existed, whether Plaintiff agreed to arbitrate her dispute. The Court of Appeals for the Third Circuit has explained the difference between the two agreements:

> In browsewrap agreements, a company's terms and conditions are generally posted on a website via hyperlink at the bottom of the screen. Unlike online agreements where users must click on an acceptance after being presented with terms and conditions (known as "clickwrap" agreements), browsewrap agreements do not require users to expressly manifest assent. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016).
>
> There is an evolving body of caselaw regarding whether the terms and conditions in browsewrap agreements are enforceable, often turning on whether the terms or a hyperlink to the terms are reasonably conspicuous on the webpage. *See, e.g., id.; Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 30-32 (2d Cir. 2002); *Hoffman v. Supplements Togo Mgmt., LLC*, 419 N.J. Super. 596, 18 A.3d 210, 218-20 (2011). When terms are linked in obscure sections of a webpage that users are unlikely to see, courts have refused to find constructive notice. *See Nicosia*, 834 F.3d at 233; *Specht*, 306 F.3d at 30-32. On the other hand, "where the website contains an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound, courts have been more amenable to enforcing browsewrap

12

agreements." *Nguyen*, 763 F.3d at 1177.

*James v. Global TelLink Corp.*, 852 F.3d 262, 267 (3d Cir. 2017). As the Ninth Circuit stated in *Nguyen*, "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers. Given the breadth of the range of technological savvy of online purchasers, consumers cannot be expected to ferret out hyperlinks to terms and conditions to which they have no reason to suspect they will be bound." 763 F.3d at 1179.

Although SBG cites several cases involving clickwrap agreements,[11] Plaintiff correctly notes that no clickwrap agreement is involved in this case. There was no vehicle by which she was provided with an opportunity to manifest her consent to SBG's terms and conditions by clicking on a hyperlink.

SBG's citation of *HealthplanCRM, LLC v. AvMed, Inc.*, 458 F. Supp. 3d 308 (W.D. Pa. 2020) in support of its position is unpersuasive. Unlike the procedure put in place by SBG, the court described the agreement in *HealthplanCRM* as follows:

> The link to the End-User Agreement appears no more than an inch below the log-in boxes, and it is both above and set apart from the "large paragraph" of text NTT references (which is itself only six sentences long). The link is not concealed at the bottom of a webpage or hidden in fine print. What's more, the blue hyperlink to access the full End-User Agreement stands out against the white background of the log-in page and appears in a sentence which straightforwardly advises the user that "[u]se of Cavulus constitutes acceptance" of the linked agreement.

*Id.* at 333. In addition, the court also found relevant the fact that the notice explicitly warned users (directly below the log-in button) that "use" of the software "constitutes acceptance." "Thus, while not strictly 'clickwrap,' the agreement here similarly avoids the concerns regarding

---

[11] *See Happy*, 744 F. Supp. 3d at 414; *Ciapinska v. Tinder, Inc.*, 2024 WL 4024093, at *5 (D.N.J. Aug. 30, 2024); *Hine v. LendingClub Corp.*, 2023 WL 8113234, at *7 (W.D. Pa. Nov. 22, 2023); *Toth v. Everly Well, Inc.*, 118 F.4th 403, 411 (1st Cir. 2024); *Nicosia*, 834 F.3d at 233; *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033-34 (7th Cir. 2016).

13

lack of notice and manifested assent that often lead courts to decline to enforce pure browsewrap agreements buried 'in obscure sections of a webpage that users are unlikely to see[.]'" *Id.* at 334 (quoting *James*, 852 F.3d at 267).

SBG argues that Plaintiff cannot avoid the application of an arbitration provision by failing to read it or click on a hyperlink that would lead to it. See *Hine*, 2023 WL 8113234, at *7; *Ciapinska*, 2024 WL 4024093, at *5. However, because the April 2023 Terms, which were in place when Plaintiff became a RentPlus customer, did not have an arbitration provision for Plaintiff to read or click on a hyperlink to review, SBG must show that Plaintiff was bound by the addition of an arbitration provision in the June 2024 Terms.

    C.  <u>Is Plaintiff Bound by the June 2024 Terms?</u>

SBG is correct that language in both the April 2023 and June 2024 Terms provides that SBG reserves the right to modify its terms and that it is Plaintiff's responsibility to check periodically for changes. However, SBG neglects to discuss the impact of the very next sentence, that is, "Your continued use of the Site following the posting of changes will mean that you accept and agree to the changes." (Gardner Decl. Ex. A at 1.) Applying this language as drafted by SBG, Plaintiff could not have accepted and agreed to any changes, including the new arbitration provision, without her continued use of the site.[12] There is no evidence, nor does either party represent, that Plaintiff continued to use the site after the June 2024 Terms were posted.

Plaintiff notes that "a party cannot modify a contract unilaterally. All the parties whose rights or responsibilities the modification affects must consent." *St. Joe Corp. v. McIver*, 875 So. 2d 375, 382 (Fla. 2004). *See also Medley v. Dish Network, LLC*, 958 F.3d 1063, 1070 (11th Cir.

---

[12] Plaintiff's payment of the RentPlus fee directly to her landlord did not involve the use of the RentPlus site.

14

2020) ("it is black-letter contract law that one party to an agreement cannot, without the other party's consent, unilaterally modify the agreement once it has been executed.") As the party alleging the existence of a contract, SBG has the burden to prove each element of a valid agreement to arbitrate, including mutual assent. It has failed to do so. Given Plaintiff's uncontroverted declaration that she never accessed the website, let alone continued to use it after the June 2024 Terms were in place, she could not have agreed to their changes. Thus, by the very terms imposed by SBG, there was no meeting of the minds regarding an agreement to arbitrate this dispute.

SBG also takes the position that it can unilaterally change its terms at any time without notice and it was Plaintiff's responsibility to check the Terms of Use periodically to see if they had changed. However, courts have held that "[p]arties to a contract have no obligation to check the terms on a periodic basis to learn whether they have been changed by the other side." *Stover v. Experian Holdings, Inc.*, 978 F.3d 1082, 1086 (9th Cir. 2020) (quoting *Douglas v. U.S. Dist. Ct. for Cent. Dist. of California*, 495 F.3d 1062, 1066 (9th Cir. 2007)). As the *Stover* court explained:

> Although the 2014 terms contained a change-of-terms provision, nothing in *Douglas* suggests that mere inquiry notice of changed terms is enough to bind the parties to them. Stover assented only once to the terms of a single contract that Experian later modified without providing notice. Just as in *Douglas*, Stover had no obligation to investigate whether Experian issued new terms without providing notice to her that it had done so. Indeed, the opposite rule would lead to absurd results: contract drafters who included a change-of-terms provision would be permitted to bind individuals daily, or even hourly, to subsequent changes in the terms. The absence of limits on the frequency or substance of changes in terms subverts the basic rule of contract law that "[a] contract exists where the parties assent to the same thing in the same sense, so that their minds meet." 17A Am. Jur. 2d Contracts § 30 (August 2020 Update) (footnotes omitted). We therefore hold that in order for changes in terms to be binding pursuant to a change-of-terms provision in the original contract, both parties to the contract—not just the drafting party—must have notice of the change in contract terms.

*Id. See also Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 123 (2d Cir. 2012) ("We do not think that an unsolicited email from an online consumer business puts recipients on inquiry notice of the terms enclosed in that email and those terms' relationship to a service in which the recipients had already enrolled, *and* that a failure to act affirmatively to cancel the membership will, alone, constitute assent."); *Optimum Constr., Inc. v. Harbor Bus. Compliance Corp.*, 2022 WL 4608170, at *7 (D. Md. Sept. 30, 2022) ("the only way Optimum could have avoided inadvertently accepting modified terms of use it might find unacceptable would be to check the multi-page terms of use hyperlinked on the log-in page against the October 2017 version *every* time before logging into its account. The law does not impose any such burden on website users subject to an online adhesion contract.") SBG cites no authority to the contrary.

    Finally, it must also be noted that the mandatory arbitration provision is far from transparent. It appears in the middle of a lengthy paragraph on page 12 of the terms and conditions under the heading "General." When consumers have been sent updates that contain an arbitration provision, courts have evaluated the extent to which these update notices were conspicuous. *See Engen v. Grocery Delivery E-Servs. USA Inc.*, 453 F. Supp. 3d 1231, 1240 (D. Minn. 2020) (notice of update to an agreement that "appears in small print at the bottom of the page, beneath the email's main promotional content, beneath hyperlinks to download HelloFresh's 'app,' beneath hyperlinks to HelloFresh's social media sites, and beneath a lengthy disclaimer regarding the promotional offer" was "not clear and conspicuous" but was "buried at the bottom of the page" and did not give the customer "notice of or assent to hyperlinked terms of use."); *Murray v. Grocery Delivery E-Servs. USA Inc.*, 460 F. Supp. 3d 93, 98-99 (D. Mass. 2020) ("the new terms were hyperlinked at the bottom of a page full of loud, colorful text regarding sales. They were hidden in small print in a paragraph of other text and there was

nothing to draw attention to them or to suggest a change. The terms were in black text while the rest of the email's promotions were spattered in bright green and yellow. These updated terms were not conspicuously communicated to Murray.")

Thus, even if Plaintiff had accessed the RentPlus website, the lack of conspicuousness of the arbitration clause, the lack of a meaningful choice and its inconvenient venue in Salt Lake City, Utah also support Plaintiff's position that the clause is unconscionable. *See Salley v. Option One Mortg. Corp.*, 925 A.2d 115, 119 (Pa. 2007) ("a contract or term is unconscionable, and therefore avoidable, where there was a lack of meaningful choice in the acceptance of the challenged provision and the provision unreasonably favors the party asserting it."); *James*, 852 F.3d at 267 (terms and conditions in browsewrap agreements are enforceable if they are reasonably conspicuous on the webpage, but not if linked in obscure sections of a webpage that users are unlikely to see); *Newton v. Am. Debt Servs., Inc.*, 854 F. Supp. 2d 712, 726 (N.D. Cal. 2012), *aff'd*, 549 F. App'x 692 (9th Cir. 2013) (arbitration clause requiring consumers to arbitrate their claims in the defendants' home city of Tulsa, Oklahoma gave them an unfair advantage at the consumer's expense); *Equitable Life & Cas. Ins. Co. v. Ross*, 849 P.2d 1187, 1190 (Utah Ct. App. 1993) (under Utah law, "Procedural unconscionability centers on the relative positions of the parties and the circumstances surrounding the execution of the contract, and occurs where there is an absence of meaningful choice and where lack of education or sophistication results in no opportunity to understand the terms of the agreement.")

For these reasons, Defendant's Motion to Stay Proceedings and Compel Arbitration (ECF No. 14) will be denied.

An appropriate order follows.

Dated: April 17, 2025 /s/Patricia L. Dodge
PATRICIA L. DODGE
UNITED STATES MAGISTRATE JUDGE